STATE of Missouri, ex rel. MIDWEST
GAS USERS' ASSOCIATION,
Appellant,

v.

PUBLIC SERVICE COMMISSION OF
THE STATE OF MISSOURI,
Respondent,

Missouri Gas Energy, Intervenor–
Respondent.

No. WD 53810.

Missouri Court of Appeals,
Western District.

June 2, 1998.

As Modified Sept. 1, 1998.

Application for Transfer Denied
Oct. 20, 1998.

Stuart W. Conrad, Jeremiah D. Finnegan, Finnegan, Conrad & Peterson, L.C., Kansas City, for appellant.

Gary W. Duffy, Brydon, Swearengen & England, P.C., Jefferson City, for Intervenor–Respondent Missouri Gas Energy.

Penny G. Baker, Deputy Gen. Counsel, Jefferson City, for Respondent Public Service Commission.

Before SPINDEN, P.J., and LAURA DENVIR STITH and EDWIN H. SMITH, JJ.

LAURA DENVIR STITH, Judge.

Relator Midwest Gas Users' Association appeals the decision of the Missouri Public Service Commission ("PSC") allowing Missouri Gas Energy to use its purchased gas adjustment/ actual cost adjustment ("PGA/ ACA") clause to charge its transportation

customers—that is, customers who use its lines only to transport gas bought elsewhere—for costs which Relator says should be borne only by those who actually purchase gas from Missouri Gas Energy. We find that the PSC was within its authority in permitting Missouri Gas Energy to use a PGA/ACA clause to pass on the costs at issue, that it acted reasonably and within its authority in permitting those costs to be passed on to both transportation and sales customers, and that the record supported the determinations of the PSC. Accordingly, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The general background facts about the natural gas industry necessary to an understanding of this case are the same as those which are necessary to an understanding of our decision in the companion case also handed down today, *State ex rel. Midwest Gas Users' Ass'n v. Public Service Comm'n,* 976 S.W.2d 470 (Mo.App.1998). Because of the complexity of these facts and their importance to our decision, rather than simply referring the reader to the companion case we again set out herein the key background facts about the natural gas industry nationally,[1] and in Missouri. *See* Sections I.A. and I.B. below. Those facts which are peculiarly relevant to this case are set out in Section I.C to I.E. below and in the legal analysis contained in Sections III and IV below.

### A. Federal Regulation of the Natural Gas Industry by the Federal Power Commission and Adoption of Federal PGA Clause.

Traditionally, the natural gas industry was divided into three groups: producers, transporters, and distributors. A producer extracted the gas from a well and sold it to a transporter. The transporter moved the gas through a pipeline using one of two forms of transportation service: firm transportation, for which delivery is guaranteed; or interruptible transportation, for which delivery

can be delayed if the pipeline's capacity is completely in use. The transporter then resold the fuel to a local distribution company, such as Missouri Gas Energy, hereinafter referred to as "MGE." The local distribution company, sometimes called an "LDC," in turn distributed the gas through its local lines to residential customers, as well as to industrial users such as the members of Midwest Gas Users' Association, hereinafter referred to as "MGUA."

Because of economies of scale, pipelines have what amounts to a natural monopoly over the transportation of natural gas. In addition, many customers are "captive" in the sense that they are served by only a single pipeline. In order to protect consumers from exploitation of the pipelines' monopoly power, the government began regulating the natural gas industry. In 1938, Congress passed the Natural Gas Act, which gave the Federal Power Commission the authority to regulate the interstate transportation of gas and the sale of gas which was for resale in interstate commerce, but gave the states jurisdiction to regulate the local distribution of gas.

Instead of solely regulating transportation, the source of the monopoly power in the industry, the Federal Power Commission also regulated the prices charged by producers to transporters. The pipelines passed increases or decreases in the cost of gas to their sales customers through use of a purchased gas adjustment ("PGA") clause. The PGA clause permitted the pipelines to automatically adjust the rates they charged local distribution companies in proportion to the change in the rate they had to pay for gas from their suppliers.

### B. Partial Deregulation of Natural Gas Industry by Federal Energy Regulatory Commission and Creation of Take–or–Pay Clauses and Resultant Costs.

By the late 1970s, Congress became dissatisfied with the existing method of regulation of producers' prices and found it caused distortions in the natural gas sales market.

---

1. For a more detailed history of the natural gas industry, see *United Distribution Companies v. Federal Energy Regulatory Commission,* 88 F.3d 1105 (D.C.Cir.1996), *cert. denied sub nom., Asso-*

*ciated Gas Distributors v. Federal Energy Regulatory Comm'n,* — U.S. ——, 117 S.Ct. 1723, 137 L.Ed.2d 845 (1997).

Thus, in 1977, it created the Federal Energy Regulatory Commission ("FERC"). The latter replaced the Federal Power Commission as the entity regulating the gas industry at the federal level. In 1978, in response to the severe gas shortage of the late 1970's, Congress enacted the Natural Gas Policy Act. It provided for the gradual elimination of regulation of the producers' prices for natural gas.

In the late 1970's and early 1980's, while producers' prices were still in the process of deregulation, the energy crisis led many pipeline companies to become concerned that their supply of natural gas would not be sufficient to meet their demand. To ensure the long-term availability of an adequate supply of gas, many pipeline transporters entered into 20–year contracts for gas. These contracts contained what are known as "take-or-pay" clauses. The latter required the pipelines to purchase minimum quantities of gas from producers at a cost that, while perhaps reasonable when the contracts were entered, turned out to be much higher than the market price of gas once the energy crisis ended. The clauses got their name as "take-or-pay" clauses because, if the pipelines failed to "take" all the gas called for by these contracts, they had to "pay" very substantial penalties.

By the 1980's, in order to restrain the pipelines' monopoly over transportation and eliminate anti-competitive conditions, FERC took various actions to directly regulate the pipelines sale and transport of gas. Pipeline sales customers purchase their gas from the pipeline. In contrast, pipeline transportation customers, typically large industrial and commercial consumers, purchase their gas directly from suppliers, and only arrange for transportation through the pipeline company's pipe system.

In Order No. 436, issued in 1985, FERC began to limit pipelines to the transportation of gas and remove them from the business of selling gas. Open-access pipelines therefore were required to allow existing firm-sales customers to convert to firm-transportation customer. This meant they had the option of buying gas directly from the wellhead rather than from the pipeline, and then simply using the pipeline to transport the gas purchased elsewhere. Because pipelines were still paying higher-than-market rates under their "take-or-pay" contracts, many former sales customers of the pipelines took advantage of this opportunity; they bought their gas elsewhere and became mere transportation customers of the pipelines. The pipelines thus had fewer buyers for their gas, yet they still had to either buy the amount they had previously contracted for or pay huge penalties under their "take-or-pay" contracts. To resolve this problem, they had to either "buy-down" or "buyout" their contracts.

*C. Account 191 and GSR Transition Costs of Deregulation and the Pass-through of these Costs and of Take–or–Pay Costs at the State Level.*

In 1992, in Order No. 636, FERC also mandated that pipelines completely separate, or "unbundle," their sales and transportation services in an effort to eliminate the distortion in the sales market the pipelines' monopoly over transportation created. This transition of pipelines from selling gas to simply transporting gas and mandatory "unbundling" of services caused a number of types of transition costs for interstate pipelines, two of which are at issue here: "Account 191 costs" and gas supply realignment, or "GSR costs." [2]

"Account 191 costs" represent unrecovered costs or credits from the pipelines' earlier purchase of natural gas for resale. "GSR costs" are the costs incurred by the pipelines in reforming or cancelling take-or-pay contracts when terminating their sales function. FERC allowed pipelines to direct bill their local distribution company customers—companies such as MGE—for Account 191 costs and GSR costs.

---

**2.** Pipelines also incurred stranded costs, which refers to the costs of assets previously used to provide bundled services and which were not used to provide unbundled services, and new facility costs, which refers to costs for new equipment needed to implement Order No. 636. However, neither of these costs are at issue in this appeal. The pipelines recover these costs through regular rate proceedings and are not allowed to direct bill their customers for these costs.

D. Regulation of Gas Utilities at the State Level and Pass–Through of Take–or–Pay and other Costs Through State PGA Clause.

Pursuant to tariffs approved by FERC, the pipelines passed on their transition costs to local distribution companies like MGE. Under the "filed rate doctrine" the States may not prohibit MGE or other local distribution companies from, in turn, passing on these FERC-approved costs to their customers. *Mississippi Power and Light Co. v. Mississippi ex. rel. Moore,* 487 U.S. 354, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988); *Nantahala Power and Light Co. v. Thornburg,* 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). However, the Natural Gas Act allows the local regulatory authority to determine just how the local distribution company will be permitted to allocate those costs among its customers. The state regulatory agencies, such as Missouri's PSC, also have the authority to review the prudence of a local distribution company's decision to enter into a particular contract when a less costly alternative is available. *American–National Can Co. v. Laclede Gas Co.,* 30 Mo. P.S.C. (N.S.) 32 (1989), *quoting, Pike County Light and Power Co. v. Pennsylvania Public Utility Comm'n,* 77 Pa.Cmwlth. 268, 465 A.2d 735 (1983).

The subject of the present controversy is whether and how LDCs like MGE are permitted to pass on their take-or pay costs, Account 191 costs, and GSR costs to their sales customers and to their transportation customers, including members of MGUA, through use of a PGA/ACA clause. Until 1962, local distribution companies in Missouri recovered the wholesale costs of purchasing gas in a general rate proceeding. If the wholesale price of gas changed, a local distribution company was required to file an application with Missouri's PSC to increase or decrease the rate it charged its customers. As noted earlier, at the federal level FERC allowed pipelines to utilize a purchased gas adjustment clause, or PGA clause, to deal with variations in their costs for gas. To deal with the similar situation experienced by local distribution companies also "caused by increasingly frequent changes in the wholesale prices for gas which in turn have. increased the frequency of applications for changes in retail rates to reflect the wholesale rate changes," in 1962 Laclede Gas Company applied for authorization from the PSC to include a PGA clause in its rates also. *In the matter of Laclede Gas Co. to file and make effective increased rates for natural gas service.* 10 Mo. P.S.C. (N.S.) 442 (1962).

While the technicalities of Missouri's PGA clause have varied over the years, the clause's basic function has remained the same: a PGA clause allows the local distribution companies to automatically adjust the rates it charges its customers in proportion to the change in the rate the local distribution company is charged by its wholesale suppliers. At the end of every twelve-month period, the local distribution company then makes an actual cost adjustment ("ACA") filing with the PSC so that the PSC can determine whether the estimated amount previously charged customers accurately reflects the actual cost to the utility of the gas supplied.[3]

In 1985, in response to the regulatory changes at the federal level discussed above, Missouri's PSC began to investigate the effect of these regulatory changes on natural gas corporations in Missouri. The PSC found that, despite these changes, the PGA clause was still "the most efficient method of recovering purchased gas costs and should remain intact," but determined to explore the effects of deregulation again in the future. *In the matter of the investigation of developments in the transportation of natural gas and their relevance to the regulation of natural gas corporations in Missouri,* 29 Mo. P.S.C. (N.S.) 137, 144 (1987). On October 19, 1989, the PSC issued two orders reaffirming its position that a PGA clause was the proper method for recovering purchased gas costs. The PSC held that take-or-pay costs charged to a local distribution company by its upstream pipeline suppliers could be legally

---

**3.** In the companion case, the PSC approved use of an experimental gas costs incentive mechanism for a three year period. No such incentive PGA mechanism was approved by the PSC in this case, and it is not an issue on this appeal.

passed on to the company's customers through its PGA clause. *American–National Can Co. v. Laclede Gas Co.*, 30 Mo. P.S.C. (N.S.) 32 (1989). The PSC specifically held that these costs could not be recovered through a separate tariff proceeding. *In the matter of Missouri Public Service Company's tariff filing to implement recovery of take–or–pay settlement costs in a take–or–pay recovery rider*, 30 Mo. P.S.C. (N.S.) 39 (1989).

*E. PSC Approval of MGE's Allocation of Take–or–Pay and Transition Costs to Sales and Transportation Customers.*

*1. Take–or–Pay Costs.* On August 20, 1993, Western Resources, Inc.,[4] a public utility providing natural gas service in Kansas City and other parts of western Missouri, made an ACA filing for the period from July 1, 1992, through June 30, 1993 (GR–93–140). Western sought to recover "take-or-pay" costs that were passed on to it by Williams Natural Gas through a PGA clause. "MGUA", a nonprofit association representing commercial and industrial users of natural gas, intervened.

MGUA argued that Western's "take-or-pay" costs should not be passed through its PGA/ACA mechanism to transportation customers. (As will be recalled, transportation customers are those large industrial and commercial customers who do not purchase their natural gas from a local distribution company, such as MGE, but only used the local company's distribution network to have the gas transported to them). MGUA argued that these costs are simply a type of sales cost since they arose out of the pipelines' 1970's "take-or-pay" contracts with suppliers.

Western countered that these "take-or-pay" costs nonetheless should be recovered from all customers, including transportation customers, because these costs resulted from federal deregulation, and deregulation is what made the take-or-pay clauses so onerous and is what benefitted transportation customers by allowing them to purchase from numerous sources.

Following a hearing, and effective July 25, 1995, the PSC issued a Report and Order allowing MGE to use its PGA to charge take-or-pay costs to MGE transportation customers.

In a motion for rehearing, MGUA also argued that the use of a PGA/ACA clause is itself unlawful under Missouri law as applied either to transportation or sales customers, because it constitutes single-issue ratemaking and retroactive ratemaking. Rehearing was denied.

*2. GSR Costs and Account 191 Costs.* Similarly, on August 5, 1994, Missouri Gas Energy filed with the PSC a proposed revision to its PGA clause intended to recover Account 191 costs and GSR costs that had been billed to it by its pipelines in Case GR–95–33. MGUA intervened.

MGE proposed allocating Account 191 and GSR costs to sales customers only. For reasons similar to those leading it to approve pass-through of take-or-pay charges to transportation customers, in its Report and Order, effective June 6, 1995, the PSC staff recommended allocating GSR costs to both sales and transportation customers, finding both had benefitted from deregulation and were partially responsible for these costs. The PSC staff also recommended that Account 191 costs from the pipelines' most recent annual PGA period, classified as TC Factor 1, be allocated only to sales customers since these costs were attributable only to them. However, the staff recommended that all other Account 191 costs, classified as TC Factor 2, be allocated to both sales and transportation customers. Its rationale for this recommendation was that many current transportation customers were sales customers of the pipelines at the time that TC Factor 2 costs were incurred by the pipelines. The PSC issued a Report and Order effective June 6, 1995, authorizing MGE to allocate GSR costs and Account 191 TC Factor 2 costs to both sales and transportation customers.

MGUA appealed all three rulings to the circuit court. It affirmed the PSC's decision to allow MGE to pass on its take-or-pay costs, Account 191 TC Factor 2 costs and

---

**4.** Western Resources, Inc. was subsequently ac- quired by Missouri Gas Energy ("MGE").

GSR costs. MGUA now appeals to this Court.

## II. STANDARD OF REVIEW AND PRESERVATION OF ERROR

■ On appeal, we review the decision of the PSC, not the judgment of the circuit court. *State ex rel. Office of the Pub. Counsel v. Public Serv. Comm'n*, 938 S.W.2d 339, 341 (Mo.App.1997). The PSC's order has a presumption of validity, and the burden is on the party attacking it to prove its invalidity. *State ex rel. Mobile Home Estates, Inc. v. Public Serv. Comm'n*, 921 S.W.2d 5, 9 (Mo. App.1996).

■ Judicial review of the PSC's order is conducted using a two-part test. *State ex rel. Utility Consumers Council, Inc. v. Public Serv. Comm'n*, 585 S.W.2d 41, 47 (Mo. banc 1979). First, we must determine whether the PSC's order was lawful. *Id.* An order's lawfulness depends on whether the PSC's order and decision was statutorily authorized. *Office of the Pub. Counsel*, 938 S.W.2d at 341. When determining whether the order is lawful, we exercise independent judgment and must correct erroneous interpretations of the law. *Burlington N. R.R. v. Director of Revenue*, 785 S.W.2d 272, 273 (Mo. banc 1990). "In determining the statutory authorization for, or lawfulness of, the order we need not defer to the commission, which has no authority to declare or enforce principles of law or equity." *Utility Consumers Council*, 585 S.W.2d at 47.

■ Second, we must determine whether the PSC's order was reasonable. *Utility Consumers Council*, 585 S.W.2d at 47. An order's reasonableness depends on whether it was supported by substantial and competent evidence on the whole record. *Office of the Pub. Counsel*, 938 S.W.2d at 341. We must determine whether the decision was arbitrary, capricious, or unreasonable, or whether the PSC abused its discretion. *State ex rel. Chicago, Rock Island & Pac. R.R. Co. v. Public Serv. Comm'n*, 312 S.W.2d 791, 794 (Mo. banc 1958). "Substantial evidence" is competent evidence which, if true,

has a probative force on the issues. *State ex rel. Rice v. Public Serv. Comm'n*, 359 Mo. 109, 220 S.W.2d 61 (1949). If the PSC's decision is based on purely factual issues, we may not substitute its judgment for that of the PSC. *Office of the Pub. Counsel*, 938 S.W.2d at 342.

## III. THE PSC HAS AUTHORITY TO UTILIZE A PGA/ACA CLAUSE

■ From our review of the argument section of the briefs, we have been able to discern from MGUA's first two points that it believes that the PSC's use of a PGA clause constitutes improper single-issue ratemaking and retroactive ratemaking because the PSC considers gas costs separately from other costs in deciding on whether a particular PGA or ACA clause is prudent and should be approved, and because it considers past costs in determining the costs which the utilities can pass on to customers through their ACA clause.

The PSC counters that MGUA failed to preserve this issue because it first raised it in its Motion for Rehearing. MGUA argues that the PSC and courts have always treated issues raised in a Motion for Rehearing before the PSC as being timely raised. The PSC responds that only issues relating to the take-or-pay costs were raised in the motion for rehearing.

We need not resolve these issues. Assuming that MGUA adequately preserved the issue of the legality of the PSC's use of a PGA/ACA mechanism, its arguments duplicate the arguments made in Points Relied On I and II in the companion case we also decide this date, *State ex rel. Midwest Gas Users' Ass'n v. Public Service Comm'n*, 976 S.W.2d 470 (Mo.App.1998).[5] For the reasons stated in Sections III.B, C, and E of our decision in that case, we find that the PSC is authorized to utilize a PGA/ACA clause and that the use of such a clause does not constitute single-issue or retroactive ratemaking. Accordingly, we reject MGUA's attack on the authority

---

5. As noted above, there is a distinction in the arguments in the two cases in that the lawfulness of the experimental gas costs incentive mecha-

nism is not at issue on this appeal since MGE did not request it be adopted in this case and the PSC did not order it to be in effect in this case.

of the PSC to authorize MGE's use of a PGA/ACA to pass on take-or-pay and transition costs generally.

### IV. THE PSC'S DECISION TO PERMIT MGE'S PGA CLAUSE TO BE USED TO PASS ON TAKE–OR–PAY, GSR, AND ACCOUNT 191 COSTS TO TRANSPORTATION CUSTOMERS WAS REASONABLE AND SUPPORTED BY THE EVIDENCE

MGUA also argues that, even if Missouri law does not prohibit the PSC from approving MGE's use of a PGA/ACA mechanism to pass on take-or-pay and transition costs to MGE's sales customers, it was arbitrary and unreasonable for the PSC to permit the PGA clause to be used to pass on take-or-pay, GSR, and Account 191 costs to transportation customers, and MGUA members are all transportation customers. It also argues that the decision was not supported by substantial evidence, and that the PSC's findings of fact did not adequately set out the basis of their decision.

Our review of the propriety of each of these decisions by the PSC is guided by the principle that:

> "All rates, tolls, charges, schedules and joint rates fixed by the commission shall be in force and shall be prima facie lawful, and all regulations, practices and services prescribed by the commission shall be in force and shall be prima facie lawful and reasonable until found otherwise in a suit brought for that purpose pursuant to the provisions of this chapter."

§ 386.270, RSMo 1994 (emphasis added). Here, in considering MGUA's challenge to the PSC's approval of MGE's right to use the PGA clause to charge its transportation customers these take-or-pay, GSR, and Account 191 costs, we thus start from the premise that the charges are lawful and reasonable. The burden of proof is on MGUA to prove otherwise. Moreover, the applicable statutes require it to do so by clear and convincing evidence.[6] § 386.430, RSMo 1994.

*A. Use of PGA Clause to Allocate Take-Or-Pay Costs to Transportation Customers.*

■ MGUA first argues that it was improper for the PSC to allow MGE to allocate take-or-pay costs to transportation customers of MGE who were former commercial and industrial customers of Williams Natural Gas. While it is not always easy to separate MGUA's arguments and reasoning about the evidence in the record regarding take-or-pay costs from its arguments about Account 191 and GSR costs, it is clear that it argues that the evidence required the PSC to conclude that the majority of MGE's transportation customers had no responsibility for causing take-or-pay costs to be incurred, and therefore they should not be charged for them under the PGA clause. They point to testimony by their witness which supports this determination. However, while MGUA makes viable arguments in support of its position, the PSC did not accept those arguments, and instead determined based on other evidence in the record that it was fair to charge these take-or-pay costs to transportation customers of MGE, stating:

> MGUA's members were former sales customers, although interruptible sales customers, and they are now transportation customers. WNG used the same gas supply contracts to serve both its firm and interruptible loads since it contracted to its supply on a system-wide basis. As previously stated by the Commission, "Transportation customers share, with other customers, responsibility for the purchase deficiencies which triggered TOP [take-or-pay] liabilities." *Re: Missouri Public Service,* 30 Mo. P.S.C. (N.S.) 39, 43 (1989).
>
> The Commission finds that since members of MGUA were former sales customers, it makes no difference what pipeline served the LDC [local distribution company]; the pipeline had to contract with a

6. "In all trials, actions, suits, and proceedings arising under the provisions of this chapter or growing out of the exercise of the authority and powers granted herein to the commission, the burden of proof shall be upon the party adverse to such commission or seeking to set aside any determination, requirement, direction or order of said commission, to show by clear and satisfactory evidence that the determination, requirement, direction or order of the commission complained of is unreasonable or unlawful as the case may be." § 386.430, RSMo 1994.

producer/supplier to acquire the gas, and it was these contracts, for which the members of MGUA were at least partially responsible, that led to incurrence of take-or-pay liabilities.

Thus, the PSC determined, based on the evidence, that transportation customers did have some responsibility for these take-or-pay costs even if at the relevant time they were customers of some pipeline other than WNG. Moreover, as the PSC notes in this Court, while MGUA claims this is not true as to at least some of its members, it never identified for the PSC which transportation customers it claims were not formerly sales customers at the time the take-or-pay costs were incurred. It implies that it was up to the PSC to make this determination. As noted above, however, it was up to MGUA to prove by clear and convincing evidence that the take-or-pay charges should not be passed on to its members. After considering all of MGUA's arguments, the PSC concluded that it was proper to charge both transportation and sales customers for these take-or-pay costs. We find this decision to be reasonable and to be supported by substantial and competent evidence on the record as a whole.

*B. Use of PGA Clause to Allocate GSR Costs to Transportation Customers.*

■ For reasons similar to those leading it to approve pass-through of take-or-pay charges to transportation customers, in its Report and Order, effective June 6, 1995, the PSC also authorized MGE to allocate GSR costs to both sales and transportation customers, stating:

> The Commission believes that the unbundling of gas services resulting from FERC Order 636 was designed to result in a more competitive market and GSR costs were incurred in complying with that order. Although the supply contracts affected by Order 636 were contracts for the sale of gas, the realignment costs were incurred in the pipeline's changeover from a merchant to a transporter. Since both sales and transportation customers benefit from the lower gas prices available in a more competitive market, both class should pay for that benefit.

> The Commission finds that both sales and transportation customers have benefitted from the unbundling ordered by FERC. The Commission determines that both classes of customers should share in the pass through of GSR costs on a volumetric basis.

The PSC therefore held that "MGE is entitled to pass through those transition costs ... to its customers, and that it is appropriate to pass them through by means of its PGA clause, in a similar manner to its recovery of other federally mandated charges such as Take or Pay costs."

While MGUA argues generally that it was improper for the PSC to order such costs to be passed through to transportation customers by means of the PGA clause, its arguments are the same as those rejected above in regard to take-or-pay costs. For the reason set out above, we find the PSC's decision to allows the pass-through of these GSR costs also to be reasonable and to be supported by substantial and competent evidence on the record as a whole.

*C. Use of PGA Clause to Allocate Account 191 Costs to Transportation Customers.*

■ MGUA also appeals the PSC's determination to permit MGE to revise its PGA clause to allow it to recover Account 191 TC Factor 2 costs. MGUA argued below, and argues in this Court, that it is unfair to charge it with these Account 191 costs because those costs are attributable only to the unbundling of gas services under Order No. 636 and that only sales customers are responsible for those costs. MGE actually agreed with this position before the PSC, and recommended that these Account 191 costs be passed on only to sales customers of MGE. The PSC staff and Office of Public Council disagreed, however.

The PSC staff agreed that it would not be proper to allocate the Account 191 costs from the pipelines' most recent annual PGA period—classified as "TC Factor 1 costs"—to transportation customers, for none of them had been sales customers of a pipeline during that period. MGUA agrees with that determination. The PSC staff also recommended

that all other Account 191 costs—classified as "TC Factor 2 costs"—should be allocated to both sales and transportation customers, however. Essentially, MGUA's argument is that there was no competent or substantial evidence to support the PSC's decision to charge Account 191 TC Factor 2 costs to transportation customers, and that it therefore was arbitrary and unreasonable for the PSC to so order. An order's reasonableness depends on whether it was supported by substantial and competent evidence on the whole record. *Office of the Pub. Counsel,* 938 S.W.2d at 341.

MGUA suggests that its position is supported by the testimony below of witness John M. Fernald. Mr. Fernald stated, "Account 191 costs which were incurred by the pipelines *long ago* were paid for *long ago* by those customers who were sales customers *long ago.*" MGUA also relies on the testimony of Dennis M. Kies that the Factor 2 transition costs "relate only to the provision of the natural gas that William sold to its pre-restructuring customers for resale to their sales customers." MGUA notes that it presented a chart showing that 163 sales customers had converted to transportation customers before the issuance of FERC Order No. 636 which caused the transition costs at issue here.

The PSC was not required to accept the accuracy of the testimony of MGUA's witnesses or of its chart, however, and MGUA failed to present evidence regarding the identities of the 163 sales customers who it asserts had converted to transportation customers before the issuance of FERC Order No. 636, or to even show that the PSC could reasonably be expected to be able to identify these companies.

As noted above, as the party adverse to the PSC's decision and the party seeking to set aside the PSC's Report and Order, MGUA bears the burden to show, by clear and satisfactory evidence, that the PSC's order is unreasonable. § 386.430, RSMo 1994. In addition, as the PSC points out, MGUA would be in the best position to determine *exactly which customers converted to trans-portation customers before Order No. 636,* because it is an organization comprised of

these customers and if the exact customers could be identified, MGUA would presumably possess the records to do so. By contrast, Thomas A. Solt, a regulatory auditor employed by the PSC in the Energy Department of the Utility Operations Division, specifically testified that it was impracticable to distinguish between the customers directly responsible for the charges and those that were not, stating:

> I am of the opinion that Account 191 costs *should consist of unrecovered gas costs resulting from the most recent annual pipeline PGA period.* The approximately $13.7 million of unamortized deferred gas storage costs relate to gas losses dating back to the late 1970's and early 1980's. At that point in time, the pipeline had only sales customers. Because yesterday's sales customers became both today's sales and transportation customers, both classes must bear the TCs. Therefore, it is clear that these costs should be shared by both the Company's sales and transportation customers as a cost of transition to an open access environment. These would obviously be Transition Cost Factor 2 costs.

> The $5.7 million of T & E [transportation and exchange] imbalances are costs included by Williams as Account No. 191 costs in its FERC filing which it cannot with any certainty apportion among its sales and transportation customers. It is impossible to state with any certainty whether MGE's sales customers or transportation customers were responsible for causing these costs. Both could have been responsible to some extent, and accordingly, both sales and transportation customers should be responsible for paying the associated costs. Absent a way to directly allocate responsibility for causation of these costs, I recommend that it is reasonable to share the costs between MGE's sales and transportation customers equally, on a volumetric basis. The sales and transportation customer classes would pay its share of the costs based upon throughput. These costs are also, therefore, Transition Cost Factor 2 costs.

MGUA argues that Dr. Solt's testimony should not have been credited by the PSC,

because Dr. Solt admitted he was not an expert on the federal regulatory system and that his experience was with State cases. MGUA did not object to Dr. Solt's testimony on the basis that he was not an expert, however, and therefore MGUA cannot argue now that he was not qualified to offer opinions in this area. In any event, we believe that the record supported the conclusion that, even if it would have been preferable had the witness had more experience with FERC and with regulatory procedures at the federal level, he had sufficient knowledge and experience so that his testimony would be of assistance to the PSC in reaching its determination. As such, Dr. Solt's testimony was properly admitted. *MacDonald v. Sheets,* 867 S.W.2d 627, 630 (Mo.App.1993). It was then up to the PSC to choose between the conflicting evidence presented as to the propriety of passing through these charges to transportation customers. *State ex rel. Associated Natural Gas Co. v. Public Service Comm'n,* 706 S.W.2d 870, 882 (Mo.App. 1985). We will not second guess that determination. *Geiler v. Missouri Labor and Indus. Relations Comm'n,* 924 S.W.2d 606, 608–09 (Mo.App.1996); *G.C. Serv. Ltd. Partnership v. Labor and Indus. Relations Comm'n,* 913 S.W.2d 411, 414 (Mo.App.1996).

In its Report and Order, effective June 6, 1995, the PSC clearly chose to accept Dr. Solt's testimony, as it had the right to do. It thus authorized MGE to allocate Account 191 TC Factor 2 costs to both sales and transportation customers. In so doing, it recognized that some of the transportation customers so charged would be paying for costs which they did not cause, but it reasoned as a practical matter, and in the absence of evidence as to who these customers were, that passing on the costs to all transportation customers was the only feasible way of ensuring that those transportation customers who were responsible for those costs did bear their proper burden. As the PSC stated in reaching this determination:

> In an ideal world every cent of every category of costs would be properly attributed to the cost causer. In reality, the administrative costs of attaining that kind of equity would impose an unreasonable burden on all customers. The attempt to clarify

these matters at the hearing demonstrated to the Commission the difficulty of determining which transportation customers are former sales customers, during what period of time these transporters took sales service, and what amount of TC 2 costs should be assigned to them. The Commission finds that determining which customers contributed, and how much specific customers contributed, to incurring the costs characterized as Factor 2 transition costs is not practicable. The Commission finds that at least some of the Account 191 Factor 2 costs are attributable to current transportation customers who are former sales customers. Accordingly, the Commission finds that Account 191 Factor 1 transition costs should be allocated to sales customers only, and Account 191 Factor 2 transition costs should be allocated to both sales and transportation customers on a volumetric basis.

In other words, the Commission agreed that in an ideal world the Account 191 Factor 2 costs should be borne by only those who were sales customers at the time the costs were incurred, but found that it simply was not practicable to identify who these customers were based on the information presented to the PSC.

We find that it was fully within the PSC's authority to reach this determination. As we stated in *Associated Natural Gas,* "the Commission [can] select its methodology in determining rates and make pragmatic adjustments called for by particular circumstances." 706 S.W.2d at 879–80. *See also Missourians for Tax Justice Educ. Project v. Holden,* 959 S.W.2d 100, 104–05 (Mo. banc 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2298, 141 L.Ed.2d 158 (1998) ("[T]he existence of another, even more mathematically precise method of achieving the constitution's purposes does not render the chosen method irrational for equal protection purposes. '[R]ational distinctions may be made with substantially less than mathematical exactitude.' New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).").

Based upon the testimony before it, we find that it was reasonable for the PSC to conclude that it was impracticable to allocate the Account 191 Factor 2 costs to the specific customers responsible for incurring them and to instead allocate them to all transportation customers. Accordingly, we find the PSC's decision to allow the pass-through of these costs also to be reasonable and to be supported by substantial and competent evidence on the record as a whole.

## V. THE PSC'S ORDER DID NOT LACK ADEQUATE FINDINGS OF FACT

 Finally, MGUA argues that the Commission's Report and Order in GR–93–140 and in GR–95–33 were both inadequate because the Commission "failed to make clear findings of fact which are based on the record of the extensive proceedings before the Commission and has wholly failed to relate its conclusions to any such findings." As MGUA correctly notes, the PSC is required by law to base its findings of fact on the competent evidence put before it at the hearing, and to make conclusions of law based on those findings. MGUA argues that the Commission's findings in this case are nothing more than conclusory opinions and references to the positions taken by Commission staff, and that they are not sufficiently definite and certain to allow for adequate appellate review.

We disagree. Section 536.090 states that: Every decision and order in a contested case shall be in writing, and, except in default cases disposed of by stipulation, consent order or agreed settlement, the decision, including orders refusing licenses, shall include or be accompanied by findings of fact and conclusions of law. The findings of fact shall be stated separately from the conclusions of law and shall include a concise statement of the findings on which the agency bases its order.

§ 536.090, RSMo 1994. As prior cases have noted, however, this statute does not mean that the PSC must use any particular or special format for its findings and conclusion, as long as the conclusions are set out separately from the findings and the reviewing court can determine the facts upon which the PSC's order was based. *State ex rel. St. Louis Pub. Serv. Co. v. Public Serv. Comm'n*, 365 Mo. 1032, 291 S.W.2d 95, 98 (banc 1956).

Here, as it often does, the PSC's Report and Order discussed the issues before it, the positions of the parties and the PSC's findings in a discursive, narrative form, and then referred back to these findings and this discussion in the sections formally denominated as findings and conclusions of law. "[T]he discursive form which the Commission has regularly used ... has long been accepted by the courts without objection." *State ex rel. Missouri Pub. Serv. Co. v. Fraas*, 627 S.W.2d 882, 891 (Mo.App.1981). While it may not go into the kind of detail which findings of fact sometimes entail in a civil action, we have previously recognized that it "is not required for the validity of administrative findings that they [the PSC] go into evidentiary detail." *Citizens State Bank, Marshfield v. State Banking Board*, 602 S.W.2d 895, 899 (Mo.App.1980). Rather, the key issue is whether we can determine the facts on which the order was based from the Report and Order. As is evident from our discussion in the preceding sections, the Report and Order was fully adequate to permit this review. As a result:

"For our purposes, the decisive matter is that we have no difficulty in determining from the Commission's report and order the findings upon which the order was based, and, consequently, we hold that the report and order in this case, considered as a whole, are sufficient for our review and that no purpose would be served by remanding to the Commission for a more formal and literal compliance with the provisions of Section 536.090."

*St. Louis Pub. Serv. Co.*, 291 S.W.2d at 98.

For all of the reasons stated above, we affirm the order of the PSC in all respects.

SPINDEN, P.J., and EDWIN H. SMITH, J., concur.