STATE of Missouri, ex rel. MIDWEST
GAS USERS' ASSOCIATION,
Appellant,

State of Missouri, ex rel. Office of the
Public Counsel, Appellant,

v.

PUBLIC SERVICE COMMISSION OF
THE STATE OF MISSOURI,
Respondent,

Laclede Gas Company, Intervenor–
Respondent,

Union Electric Company, Intervenor–
Respondent,

Fidelity Natural Gas Company And
Southern Missouri Gas Company,
Intervenor–Respondent,

Missouri Gas Energy, Intervenor–
Respondent.

No. WD 53811.

Missouri Court of Appeals,
Western District.

June 2, 1998.

As Modified Sept. 1, 1998.

Application for Transfer Denied
Oct. 20, 1998.

Stuart W. Conrad, Finnegan, Conrad & Peterson, Kansas City, for appellant Midwest Gas.

Douglas E. Micheel, Office of Public Counsel, Jefferson City, for appellant.

Thomas R. Schwarz, Jr., Jefferson City, for respondent Public Service Com'n.

Michael C. Pendergast, St. Louis, for intervenor-respondent, Laclede Gas Co.

Ronald K. Evans, St. Louis, for intervenor-respondent Union Elec.

James M. Fischer, Jefferson City, for intervenors-respondents Fidelity Natural Gas and Southern Mo. Gas.

Gary W. Duffy, Brydon, Swearengen & England, Jefferson City, for intervenor-respondent Mo. Gas Energy.

Before SPINDEN, P.J., and LAURA DENVIR STITH and EDWIN H. SMITH, JJ.

LAURA DENVIR STITH, Judge.

Relators Midwest Gas Users' Association and the Office of the Public Counsel appeal the decision of the Public Service Commission (PSC) authorizing Missouri Gas Energy to use a Purchased Gas Adjustment Clause (often referred to as a PGA clause) and related Actual Cost adjustment (ACA) clause and gas costs incentive mechanism in the calculation of its natural gas rates. Relators both claim that use of the PGA clause and related mechanisms is unlawful because they constitute single-issue ratemaking and retroactive ratemaking, both of which are impermissible under Missouri law. For the reasons set out below, we find that use of the PGA clause and related mechanisms does not constitute single-issue ratemaking and does not run afoul of the bar against retroactive ratemaking.

We also reject the separate contention of Relator Missouri Gas Users' Association that,

to the extent that the PGA clause permits Missouri Gas Energy to pass on certain "take-or-pay" costs to Association members, it is unlawful because Association members do not purchase gas from Missouri Gas Energy but rather simply transport gas over the latter's gas lines. The PSC found that both sales and transportation customers benefitted from the deregulation of the natural gas industry, that the take-or-pay costs passed on through the PGA clause were caused by that deregulation, and that it was thus reasonable to apply the PGA clause to both sales and transportation customers. This decision was not arbitrary, and Relator does not contend that there was no evidence in the record to support this determination. Accordingly, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In order to understand the issues on this appeal, it is necessary to have a basic understanding of certain facets of the regulation of the natural gas industry nationally,[1] and in Missouri.

### A. Federal Regulation of the Natural Gas Industry by the Federal Power Commission and Adoption of Federal PGA Clause.

Traditionally, the natural gas industry was divided into three groups: producers, transporters, and distributors. A producer extracted the gas from a well and sold it to a transporter. The transporter moved the gas through a pipeline using one of two forms of transportation service: firm transportation, for which delivery is guaranteed; or interruptible transportation, for which delivery can be delayed if the pipeline's capacity is completely in use. The transporter then resold the fuel to a local distribution company, such as Missouri Gas Energy, hereinafter referred to as MGE. The local distribution company, sometimes called an "LDC," in turn distributed the gas through its local lines to residential customers, as well as to industrial users such as the members of Mid-

west Gas Users' Association, hereinafter referred to as "MGUA."

Because of economies of scale, pipelines have what amounts to a natural monopoly over the transportation of natural gas. In addition, many customers are "captive" in the sense that they are served by only a single pipeline. In order to protect consumers from exploitation of the pipelines' monopoly power, the government began regulating the natural gas industry. In 1938, Congress passed the Natural Gas Act, which gave the Federal Power Commission the authority to regulate the interstate transportation of gas and the sale of gas which was for resale in interstate commerce, but gave the states jurisdiction to regulate the local distribution of gas.

Instead of solely regulating transportation, the source of the monopoly power in the industry, the Federal Power Commission also regulated the prices charged by producers to transporters. The pipelines passed on increases or decreases in the cost of gas to their sales customers through use of a purchased gas adjustment ("PGA") clause. The PGA clause permitted the pipelines to automatically adjust the rates they charged local distribution companies in proportion to the change in the rate they had to pay for gas from their suppliers.

### B. Partial Deregulation of Natural Gas Industry by Federal Energy Regulatory Commission and Creation of Take–or–Pay Clauses and Liabilities.

By the late 1970s, Congress became dissatisfied with the existing method of regulation of producers' prices and found it caused distortions in the natural gas sales market. Thus, in 1977, it created the Federal Energy Regulatory Commission ("FERC"). The latter replaced the Federal Power Commission as the entity regulating the gas industry at the federal level. In 1978, in response to the severe gas shortage of the late 1970's, Congress enacted the Natural Gas Policy Act. It provided for the gradual elimination of regu-

---

1. For a more detailed history of the natural gas industry, see *United Distribution Companies v. Federal Energy Regulatory Commission,* 88 F.3d 1105 (D.C.Cir.1996), *cert. denied sub nom., Asso-* *ciated Gas Distributors v. Federal Energy Regulatory Comm'n,* —— U.S. ——, 117 S.Ct. 1723, 137 L.Ed.2d 845 (1997).

lation of the price that producers charged for natural gas.

In the late 1970's and early 1980's, while producers' prices were still in the process of deregulation, the energy crisis led many pipeline companies to become concerned that their supply of natural gas would not be sufficient to meet their demand. To ensure the long-term availability of an adequate supply of gas, many pipeline transporters entered into 20–year contracts for gas. These contracts contained what are known as "take-or-pay" clauses. *The latter required the pipelines to purchase minimum quantities of gas from producers at a cost that, while perhaps reasonable when the contracts were entered, turned out to be much higher than the market price of gas once the energy crisis ended.* The clauses got their name as "take-or-pay" clauses because, if the pipelines failed to "take" all the gas called for by these contracts, they had to "pay" very substantial penalties.

By the 1980's, in order to restrain the pipelines' monopoly over transportation and eliminate anti-competitive conditions, FERC took various actions to directly regulate the pipelines' sale and transport of gas. Pipeline sales customers purchase their gas from the pipeline. In contrast, pipeline transportation customers, typically large industrial and commercial consumers, purchase their gas directly from suppliers, and only arrange for transportation through the pipeline company's pipe system.

In Order No. 436, issued in 1985, FERC began to limit pipelines to the transportation of gas and remove them from the business of selling gas. Open-access pipelines therefore were required to allow existing firm-sales customers to convert to firm-transportation customer. This meant they had the option of buying gas directly from the wellhead rather than from the pipeline, and then simply using the pipeline to transport the gas purchased elsewhere. Because pipelines were still paying higher-than-market rates under their "take-or-pay" contracts, many former sales customers of the pipelines took advantage of this opportunity; they bought their gas elsewhere and became mere transportation customers of the pipelines. The pipelines thus

had fewer buyers for their gas, yet they still had to either buy the amount they had previously contracted for or pay huge penalties under their "take-or-pay" contracts. To resolve this problem, they had to either "buydown" or "buyout" their contracts.

Finally, in 1992, in Order No. 636, FERC mandated that pipelines completely separate, or "unbundle," their sales and transportation services in an effort to eliminate the distortion in the sales market the pipelines' monopoly over transportation created. This transition of pipelines from selling gas, to simply transporting gas and mandatory "unbundling" of services, caused a number of types of transition costs for interstate pipelines, the nature of which are described in greater detail in our companion decision, also handed down this day, in *State ex rel. Midwest Gas Users' Ass'n v. Public Service Comm'n,* 976 S.W.2d 485 (Mo.App.1998).

*C. Regulation of Gas Utilities at the State Level and Pass–Through of Take–or–Pay and other Costs Through State PGA Clause.*

Pursuant to tariffs approved by FERC, the pipelines passed on their gas costs to local distribution companies like MGE through a PGA clause. Under the "filed rate doctrine" the States may not prohibit MGE or other local distribution companies from, in turn, passing on these FERC-approved costs to their customers. *Mississippi Power and Light Co. v. Mississippi ex. rel. Moore,* 487 U.S. 354, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988); *Nantahala Power and Light Co. v. Thornburg,* 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). However, the Natural Gas Act allows the local regulatory authority to determine just how the local distribution company will be permitted to allocate those costs among its customers. The state regulatory agencies, such as Missouri's PSC, also have the authority to review the prudence of a local distribution company's decision to enter into a particular contract when a less costly alternative is available. *American–National Can Co. v. Laclede Gas Co.,* 30 Mo. P.S.C. (N.S.) 32 (1989), *quoting, Pike County Light and Power Co. v. Pennsylvania Public*

*Utility Comm'n,* 77 Pa.Cmwlth. 268, 465 A.2d 735 (1983).

Until 1962, local distribution companies in Missouri recovered the wholesale costs of purchasing gas in a general rate proceeding. If the wholesale price of gas changed, a local distribution company was required to file an application with Missouri's PSC to increase or decrease the rate it charged its customers. As noted earlier, at the federal level FERC allowed pipelines to utilize a purchased gas adjustment clause, or PGA clause, to deal with variations in their costs for gas. To deal with the similar situation experienced by local distribution companies also "caused by increasingly frequent changes in the wholesale prices for gas which in turn have increased the frequency of applications for changes in retail rates to reflect the wholesale rate changes," in 1962 Laclede Gas Company applied for authorization from the PSC to include a PGA clause in its rates also. *In the matter of Laclede Gas Co. to file and make effective increased rates for natural gas service.* 10 Mo. P.S.C. (N.S.) 442 (1962).

While the technicalities of Missouri's PGA clause have varied over the years, the clause's basic function has remained the same: a PGA clause allows a local distribution company to automatically adjust the rates it charges its customers in proportion to the change in the rate the local distribution company is charged by its wholesale suppliers. At the end of every twelve-month period, the local distribution company then makes an actual cost adjustment ("ACA") filing with the PSC so that the PSC can determine whether the estimated amount previously charged customers accurately reflects the actual cost to the utility of the gas supplied.

In 1985, in response to the regulatory changes at the federal level discussed above, Missouri's PSC began to investigate the effect of these regulatory changes on natural gas corporations in Missouri. The PSC found that, despite these changes, the PGA clause was still "the most efficient method of recovering purchased gas costs and should remain intact," but determined to explore the effects of deregulation again in the future. *In the matter of the investigation of develop-*

*ments in the transportation of natural gas and their relevance to the regulation of natural gas corporations in Missouri.* 29 Mo. P.S.C. (N.S.) 137, 144 (1987). On October 19, 1989, the PSC issued two orders reaffirming its position that a PGA clause was the proper method for recovering purchased gas costs. The PSC held that take-or-pay costs charged to a local distribution company by its upstream pipeline suppliers could be legally passed on to the local distribution companies customers through its PGA clause. *American–National Can Co. v. Laclede Gas Co.,* 30 Mo. P.S.C. (N.S.) 32 (1989). The PSC specifically held that these costs could not be recovered through a separate tariff proceeding. *In the matter of Missouri Public Service Company's tariff filing to implement recovery of take–or–pay settlement costs in a take–or–pay recovery rider.* 30 Mo. P.S.C. (N.S.) 39 (1989).

*D. PSC Approval of PGA/ACA Clause and Experimental Incentive Mechanism.*

Western Resources, Inc. was a public utility providing natural gas service in Missouri and Kansas. Its most recent rate filing with the PSC was denoted as Case No. GR–93–240. On September 28, 1993, Western Resources entered into a Stipulation and Agreement of that rate case, providing that issues related to its PGA clause would be deferred until a later date, and that if the PSC did not establish a proceeding to consider those issues within six months, the company would file a tariff or move to establish a docket to address those issues.

In January 1994, Southern Union Company acquired all of the Missouri assets of Western Resources, Inc., with the exception of one service area. MGE, a division of Southern Union Company, agreed to assume Western Resources' rights and obligations set out in the stipulation in Case No. GR–93–240. On April 8, 1994, the PSC had not established a docket, so MGE filed a motion to establish a docket to address the PGA issues that were left unresolved by the stipulation. On April 15, 1994, the PSC issued an Order establishing Case No. GO–94–318 to consider the issues left unresolved by Case No. GR–93–240 and established a pre-hearing conference. The parties to Case No.

GR–93–240 were made parties to Case No. GR–94–318, including MGUA, a nonprofit association representing users of natural gas.

On October 19, 1994, the PSC divided the issues before it into two phases. Only Relator MGUA appeals the Phase I determination. Because of the distinct nature of the issues MGUA raises regarding Phase I, we separately set out the facts and law relating to it in Section IV of this opinion, *infra.* We thus now turn to the issues dealt with by the PSC in Phase II. The PSC's resolution of those issues is appealed by both Relators.

. While Phase II dealt with a number of issues, the principle issue it addressed was whether the PSC should eliminate the use of the PGA/ACA mechanism and utilize a traditional rate case procedure in order to provide for the recovery of gas costs, and, if not, whether it should approve use of an experimental gas costs incentive PGA mechanism suggested by MGE in lieu of the traditional ACA prudence review of gas purchase decisions.

The PSC held an evidentiary hearing on Phase II from November 6, 1995, to November 8, 1995. Effective February 14, 1996, the PSC issued a Report and Order in which it stated:

> The Commission finds that the PGA/ACA process should not be eliminated. The Commission finds that the PGA/ACA mechanism is an effective way to handle the risk associated with short term fluctuations in the price of natural gas.

The PSC concluded that it would be to the detriment of both ratepayers and MGE to eliminate the PGA/ACA mechanism and to rely on a general rate case instead, stating:

> The Commission determines that there are policy reasons of paramount importance for retaining the PGA/ACA mechanism for the recovery of gas costs paid by Missouri local distribution companies.... The Commission finds that the elimination of the PGA/ACA mechanism could result in large windfall profits to Missouri Gas Energy at the expense of ratepayers or losses so large as to threaten the financial viability of Missouri Gas Energy.

> ... Missouri statutes provide that the Commission has the duty to ensure that charges made for natural gas are just and reasonable. Section 393.130.1 RSMo. The Commission finds that rates resulting from use of the PGA/ACA mechanism are just and reasonable....

> ... The Commission concludes that a substantial portion of the cost of gas continues to be subject to FERC regulation and the PGA/ACA mechanism continues to fit well with the underlying nature of the gas costs incurred by [local distribution companies like MGE].

> The Commission finds that the natural gas industry is in the midst of a transition towards competition from regulation. The Commission finds that removal of the PGA/ACA mechanism at this time would be inappropriate. Moreover, the Commission is skeptical as to the feasibility of handling gas costs in a traditional rate case format....

The PSC also found that the experimental gas cost incentive mechanism proposed by MGE, as modified by the PSC in its order, was authorized and was of benefit to MGE and to ratepayers. Under the incentive mechanism, the PSC determines the price that it anticipates gas will cost over the following year, and then sets a benchmark price at 2% below this level. At the end of the year, when the actual gas costs for the prior year are determined, the PSC and the company will look to see if actual costs and anticipated benchmark costs varied. If the actual gas costs are determined to have met the benchmark amount or are up to 4% higher, the PSC will allow this amount of actual cost adjustment by the utility; in effect, it has determined that a 4% upward variation is prudent. If the actual gas costs were between 4% and 10% higher than the benchmark amount, the PSC has determined in advance that the gas company may only recover 50% of that difference in a cost adjustment; in effect, it has determined that the remaining 50% is imprudent. If actual gas costs are more than 10% above the benchmark, the PSC will undertake a traditional prudence review, and there will be a presumption that costs above this level were

imprudent. If the actual gas costs were between the benchmark level and 94% of that level, then 50% of the savings are passed on to the ratepayers. If actual gas costs are less than 94% of the benchmark level, then 100% of the savings will be passed on to the ratepayers.

This incentive clause is in part intended to give the companies an incentive to buy gas as cheaply as possible; they know that if costs exceed the benchmark by more than 4% they will not be able to pass all of them on to ratepayers. It is equally intended to avoid the need to conduct prudence reviews of every cost variance, no matter its size, and to reduce the regulatory burden and costs experienced by the PSC and by the utility when undertaking the ACA process. Traditionally, those costs have been high because the PSC must undertake a prudence review of all costs in each case. In approving use of the incentive clause, the PSC stated:

> The Commission finds that use of a gas cost incentive mechanism as described in this Report And Order takes advantage of the introduction of competitive forces into the wholesale natural gas market, and decreases the regulatory burden on the state and MGE while achieving an appropriate balance between the interests of MGE and MGE's ratepayers.... [T]he Commission concludes that it has the lawful authority to authorize the continued use of the PGA/ACA mechanism. The Commission further concludes that the gas cost incentive mechanism authorized by this Report And Order allows MGE to take advantage of a more competitive wholesale natural gas market while placing appropriate limits on risk borne by MGE.

Therefore, the PSC permitted MGE to implement a gas cost incentive mechanism on an experimental three-year basis.

MGUA filed an application for rehearing of the PSC's decision on Phase II, which was denied. MGUA and Office of the Public Counsel ("Relators") filed Petitions for Writ of Review. The circuit court's writs were issued on March 26, 1996. On May 9, 1996, Relators moved to consolidate the appeals of Phase I and Phase II. The circuit court granted this motion. On December 3, 1996, the circuit court issued Findings and Facts and Conclusions of Law affirming the PSC's decision as to both Phase I and Phase II. Relators appeal.

## II. STANDARD OF REVIEW AND PRESERVATION OF ERROR

■ On appeal, we review the decision of the PSC, not the judgment of the circuit court. *State ex rel. Office of the Pub. Counsel v. Public Serv. Comm'n,* 938 S.W.2d 339, 341 (Mo.App.1997). The PSC's order has a presumption of validity, and the burden is on the party attacking it to prove its invalidity. *State ex rel. Mobile Home Estates, Inc. v. Public Serv. Comm'n,* 921 S.W.2d 5, 9 (Mo. App.1996).

■ Judicial review of the PSC's order is conducted using a two-part test. *State ex rel. Utility Consumers Council, Inc. v. Public Serv. Comm'n,* 585 S.W.2d 41, 47 (Mo. banc 1979). First, we must determine whether the PSC's order was lawful. *Id.* An order's lawfulness depends on whether the PSC's order and decision was statutorily authorized. *Office of the Pub. Counsel,* 938 S.W.2d at 341. When determining whether the order is lawful, we exercise independent judgment and must correct erroneous interpretations of the law. *Burlington N. R.R. v. Director of Revenue,* 785 S.W.2d 272, 273 (Mo. banc 1990).

■ Second, we must determine whether the PSC's order was reasonable. *Utility Consumers Council,* 585 S.W.2d at 47. An order's reasonableness depends on whether it was supported by substantial and competent evidence on the whole record. *Office of the Pub. Counsel,* 938 S.W.2d at 341. We must determine whether the decision was arbitrary, capricious, or unreasonable, or whether the PSC abused its discretion. *State ex rel. Chicago, Rock Island & Pac. R.R. Co. v. Public Serv. Comm'n,* 312 S.W.2d 791, 794 (Mo. banc 1958). "Substantial evidence" is competent evidence which, if true, has a probative force on the issues. *State ex rel. Rice v. Public Serv. Comm'n,* 359 Mo. 109, 220 S.W.2d 61 (1949). If the PSC's decision is based on purely factual issues, we may not substitute our judgment for that of

the PSC. *Office of the Pub. Counsel,* 938 S.W.2d at 342.

## III. USE OF A PURCHASED GAS AD-JUSTMENT CLAUSE IS NOT PRO-HIBITED BY MISSOURI LAW

### A. Contentions of the Parties

After lengthy study of the arguments made by all parties, we discern the contentions of the parties to be as follows. Both the Office of Public Counsel and MGUA argue that the PGA clause is itself unauthorized by Missouri law because: (1) it constitutes single-issue ratemaking in that it permits the rates to be changed based on a consideration of only a single factor—gas fuel costs—in contravention of the statutory requirement that the PSC consider all factors in setting rates; and (2) it constitutes improper retroactive ratemaking, in that it improperly permits the rate charged to be changed to include past unrecovered fuel costs. In the body of their argument they also appear to argue that use of a PGA clause constitutes an abdication of the PSC's ratemaking function because it permits the utilities rather than the PSC to set rates in regard to fuel costs, and that for the same reason it runs afoul of the rule requiring utilities to have a fixed rate on file rather than a variable one, for it permits the rate to vary with the cost of gas. For the reasons set out below, we find that all of these arguments are without merit.

### B. Principles Governing Analysis of Validity of PGA are Set Out In Missouri Statutes and in State ex rel. Utility Consumers Council and Hotel Continental.

The key issue before us on this appeal us is whether Missouri statutes permit the PSC to utilize a PGA/ACA clause or an incentive mechanism in setting the rates to be charged by gas distribution companies such as MGE. Both parties agree that use of such a clause is not expressly allowed by a specific statutory section. However, as the PSC notes, the legislature is certainly aware that the PSC is using the PGA mechanism. In fact, in Section 386.610, the legislature specifically exempted from certain notice requirements "rate adjustments in the purchase price of natural gas which are approved by the commission." § 386.610 RSMo 1994. The legislature thereby has at least impliedly approved the principle that the PSC has the authority to adjust rates outside a general rate proceeding. The more specific question we must answer is whether the PSC can utilize the PGA/ACA mechanism approved below to adjust rates.

### 1. Statutes Governing PSC Regulation of Gas Utility Companies.

In order to determine whether the PSC has acted within its statutory authority in approving the PGA clause and related clauses at issue here, it is helpful to first examine the parameters of the regulatory power granted to the PSC by the legislature. Chapter 386 of the Missouri statutes provides for the creation of a Public Service Commission, or PSC, to regulate the operation of electric, gas and other utilities within the state. The basic powers and duties of the PSC are set forth in Chapter 393 of the Missouri statutes. As is evident from a review of this Chapter, the legislature has set out only the basic rules governing the PSC's regulation of gas and other utilities, and has left the details of that regulation to the PSC. Although the discretion granted to the PSC is thus broad, and does not specifically limit the PSC to use of a general rate case procedure as the only means of fixing utility rates, alternative methods of regulation adopted by the PSC must still fit within the parameters established by Section 393 and related statutes.

In this regard, Section 393.150 permits the PSC to hold a hearing on the propriety of a utility's rates on its own motion, or upon complaint by any interested party. A utility may also "file a schedule stating a new rate or charge, rule or regulation, which shall become valid unless suspended by the Commission." *Utility Consumers Council,* 585 S.W.2d at 48. *See* §§ 393.150, 393.260, 393.270. After notice, investigation and hearing, the PSC "within lawful limits may, by order, fix the maximum price of gas, ... not exceeding that fixed by statute to be charged by such corporation ...." § 393.270(2). "The price fixed by the commission ... shall

be the maximum price to be charged by such corporation or person for gas ... for a period to be fixed by the commission in the order, not exceeding three years, ..." § 393.270(3). Moreover:

> In determining the price to be charged for gas, ... the commission may consider all facts which in its judgment have any bearing upon a proper determination of the question although not set forth in the complaint and not within the allegations contained therein, with due regard, among other things, to a reasonable average rate upon capital actually expended and to the necessity of making reservations out of income for surplus and contingencies.

§ 393.270(4).[2]

These broad principles have been fleshed out and explained in a variety of cases dealing with the power and authority of the PSC to regulate rates. Both parties agree that the analysis and application of these principles in the decisions of the Missouri Supreme Court in *Utility Consumers Council* and in *Hotel Continental v. Burton,* 334 S.W.2d 75 (Mo.1960), largely determine whether the PGA/ACA clause at issue here is lawful. They strongly disagree as to exactly what those principles are and how they apply to this case, however. We thus now turn to an examination of the principles set forth in those cases and their application to this case.

**2. Analysis of Tax Adjustment Clause in *Hotel Continental.*** At issue in *Hotel Continental* was the validity of a Tax Adjustment Clause, or TAC. In that case, the PSC allowed Kansas City Power & Light Company to separately bill its steam customers for a proportionate part of any license, occupation, or other similar fee or tax which was imposed by local taxing authorities. The utility collected the tax along with its regular charges and passed on the amount of the tax to the taxing authority. The published rate schedule approved by the PSC permitted the utility to automatically adjust—that is, to vary—the tax charged to match any changes in the tax charged by the local taxing authority.

The PSC justified this result by noting that the PSC's authority to set just and reasonable rates included the power to treat one item of operating expense—there, taxes—differently than other items of operating expense where it was reasonable and just to do so. The Missouri Supreme Court agreed. It rejected arguments that use of the TAC violated the filed rate doctrine because it "permitted the company to increase or decrease its rates without filing new rate schedules and thereby denies interested parties an opportunity to be heard as to the propriety of the changed rates." *Hotel Continental,* 334 S.W.2d at 80.

In so doing, *Hotel Continental* emphasized that the utility was simply passing through tax costs to the consumer, and that when it adjusted rates, the increase or decrease in taxes went to the local taxing authority. The Court held that the use of the TAC did not constitute an abdication of the PSC's supervisory duties over rates, for the rates and the rates of return stayed the same; it was only the amount which went to taxing authorities which would change under the TAC. *Id.*

**3. Analysis of Fuel Adjustment Clause in *Utility Consumers Council.*** The electric utility companies relied on *Hotel Continental* to support their use of an automatic fuel adjustment clause, or FAC, for recovery of their fuel costs in *Utility Consumers Council,* 585 S.W.2d 41. A FAC permitted electric utilities to automatically pass on to commercial and residential consumers any increase or decrease in the costs of fuel purchased by the companies. Such clauses have been used and approved in certain states on the basis that they are more efficient and involve less regulatory lag than the usual rate case method of setting rates, although at least one other state has struck down FACs as being inconsistent with the fixed rate structure required by statute and as an abdication of that state's Public Service Commission's regulatory function. *Id.* at 50.

Missouri's PSC first adopted a FAC for electric utilities in a 1974 report and order. It modified the type of FAC permitted in a 1976 report and order. 585 S.W.2d at 45,

**2.** For a more extended discussion of these powers as they relate to the regulation of electric

utilities, the reader is referred to *Utility Consumers Council,* 585 S.W.2d at 48–49.

49–50. That is the version of FAC at issue in *Utility Consumers Council*. The FAC allowed the companies to collect a FAC for increases in fuel costs; to charge a surcharge for increases in fuel costs which had not been collected under the 1974 FAC; and to roll the amounts collected under a prior fuel adjustment clause into the utilities' basic rates. The PSC argued that use of a FAC was thus appropriate under the rationale set out in *Hotel Continental* because the PSC was simply letting the electric utilities pass on increases in fuel costs according to a formula approved by the PSC as a part of a basic rate case and set out in the companies' rate schedules. The PSC argued that, as a result, the FAC could not be criticized as improper single-issue ratemaking or as an unlawful delegation of their ratemaking authority to the electric utility companies.

The Missouri Supreme Court disagreed on numerous grounds. In particular, it distinguished *Hotel Continental* on the basis that the TAC simply allowed the PSC to treat differently an item of expense—local taxes—which was in fact different in kind from other expenses. The Court affirmed the PSC's authority to make such a differentiation, agreeing that "as a part of its duty of setting reasonable rates, the commission has the power to treat some items of operating expense differently from others," *Utility Consumers Council*, 585 S.W.2d at 52–53, so long as in doing so it does not contravene the purpose of the statutes requiring the PSC to retain regulatory control over rates. The Court reaffirmed the propriety of a TAC.

*Utility Consumers Council* found that the principles which led it to approve the TAC in *Hotel Continental* did not require it to approve use of the FAC, however, because the nature and purpose of the TAC and the FAC varied widely in regard to whether they constituted: (1) an abdication of ratemaking authority to the utilities; (2) a violation of the filed rate doctrine; (3) improper single-issue ratemaking; or (4) improper retroactive ratemaking. In their Points Relied On, appellants argue only that the PGA/ACA clause and incentive PGA/ACA clause constitute single-issue ratemaking and retroactive rate-

making. We thus consider the latter two issues.

*C. Whether PGA is Single-Issue Ratemaking.*

■ As just noted, *Utility Consumers Council* held that use of the FAC at issue there constituted single-issue ratemaking. It so held because the FAC permitted the adjustment of electric utility rates based on consideration of a single factor and without consideration by the PSC of whether other costs had decreased and thus had offset any increase in fuel costs. *Utility Consumers Council* held that this violates Section 393.270.4, which provides:

> In determining the price to be charged for gas, electricity, or water the commission may consider all facts which in its judgment have any bearing upon a proper determination of the question although not set forth in the complaint and not within the allegations contained therein, with due regard, among other things, to a reasonable rate of return upon capital actually expended and to the necessity of making reservations out of income for surplus and contingencies.

§ 393.270.4. In *State ex. rel. Missouri Water Co. v. Public Service Comm'n*, 308 S.W.2d 704, 719 (Mo.1957), and similar cases, the courts have held that this statute means that the PSC's determination of the proper rate for gas is to be based on all relevant factors rather than on consideration of just a single factor.

The TAC was approved in *Hotel Continental*, however, despite the fact that the PSC did not hold a general rate hearing every time the taxing authority changed its rates and the TAC was accordingly adjusted. It is thus evident that the PSC can comply with the requirements of Section 393.270.4 without holding a general rate hearing every time there is a change in the amount of the charge to be adjusted, whether that adjustment is for taxes or for fuel costs.

The two cases can be harmonized by application of the principle, approved in both cases, that the PSC is not required to treat all items of cost and expense in exactly the same way. The taxes to be passed on

through the TAC were different in kind from the other expenses of the utility and could not be offset by other savings. When the PSC first set the companies' rates, it considered the tax costs and other expenses and determined in a general ratemaking proceeding that in order to set a fair and reasonable rate it was required to give a different treatment to taxes than to other expenses. It thus made a TAC a part of the published rate. While the TAC permitted the amount of taxes passed on to vary as the local taxing authority changed them, this was a matter of which the PSC was aware and which it considered in approving the TAC in the first instance.

Moreover, the reasons why the PSC is not to consider some costs in isolation—because it might cause the PSC to allow the company to raise rates to cover increased costs in one area without realizing that there were counterbalancing savings in another area—did not apply to the TAC. The PSC could therefore approve use of a particular TAC mechanism at the general ratemaking proceeding, anticipating and taking into consideration at that time that the amount of adjustment would vary over time.

By contrast, the FAC was just a formula stuck into the utilities' rate schedules. The companies could substitute new numbers in the formula and begin charging them without PSC oversight or approval. For this reason, as well as because the costs at issue in the FAC in *Utility Consumers Council* were subject to the control of the utilities, and included labor costs and other costs of producing the electricity, and because the Court believed that the amount of money spent for fuel might affect the bottom line and could be offset by savings in other areas, the FAC was not approved.

Here, the PGA again shares characteristics of both the TAC and the FAC. When the PSC undertakes a general ratemaking proceeding, it considers whether to allow a PGA. The fact that a PGA is part of the rate is taken into consideration by the PSC in setting the rate approved during the rate case. By allowing a PGA, the PSC is necessarily determining that due to the unique nature of gas fuel costs, including the fact that natural

gas is a natural resource, not a product which must be produced with labor and materials, the fuel cost component of the rate must be treated differently than other components because it is different. It has therefore provided a mechanism which allows fuel cost increases to be passed on, and fuel cost savings to be passed on, in the amount incurred. As in the case of the FAC, the companies can affect their fuel costs by their choices of where to purchase their fuel. But, unlike the FAC, the PGA is *not* a formula stuck into the posted rates. Rather, the companies must set a specific PGA amount and post it as part of their rates. It is a rate, not a formula; the consumer reviewing it knows exactly what he or she is being charged. The PSC conducts a prudence review of each PGA clause and has authority to disapprove them initially. The rate and any adjustments to it are again reviewed by the PSC when it conducts a later prudence review of the PGA and of any ACA adjustment.. That it would do so was a part of the PSC's rationale in permitting the use of a PGA in the first instance. In these circumstances, we do not believe that the use of a PGA mechanism violates the principle of single-issue ratemaking.

*D. Whether PGA is Retroactive Ratemaking.*

■ Public Counsel and MGUA also argue that the ACA component of the PGA constitutes improper retroactive ratemaking. This was not a concern in regard to the TAC, for the TAC was not subject to later adjustment. By contrast, the FAC allowed electric utilities to recover after-the-fact for costs previously incurred but not permitted to be collected under a prior FAC. This was considered to be improper retroactive ratemaking because it changed a rate after it had been established and paid. Under Missouri law, however, in determining the rate to be charged, the PSC may only:

> consider past excess recovery insofar as this is relevant to its determination of what rate is necessary to provide a just and reasonable return in the future, and so avoid further excess recovery, *see State ex rel. General Telephone Co. of the Midwest v. Public Service Comm'n*, 537 S.W.2d 655

(Mo.App.1976). It may not, however, re-determine rates already established and paid without depriving the utility (or the consumer if the rates were originally too low) of his property without due process. *Utility Consumers Council,* 585 S.W.2d at 58.

We do not believe that the PGA constitutes the kind of improper retroactive ratemaking disapproved in *Utility Consumers Council.* The adjustments permitted under both the PGA and the ACA are applied only to future customers on future bills. The companies are not allowed to adjust the amount charged to past customers either up or down. More-over, the PSC conducts its prudence review of the PGA, and again conducts a prudence review of the ACA before the adjusted amount becomes a part of the rate. Even in the case of the incentive PGA/ACA clause, the PSC conducts a review of the proposed adjustment if it is above a certain threshold amount; if it is within that amount, then the PSC's prior review has already determined the adjustment to be prudent. Moreover, neither the ACA nor the incentive PGA/ACA purport to retroactively change the amounts charged under those clauses. As Respondents note, while they may consider past costs, they thus apply only in the future and thus do not constitute retroactive ratemaking.

*E. Validity of Experimental Gas Cost Incentive Mechanism.*

■ Relators also argue that, even if the basic PGA/ACA mechanism is permitted under Missouri law, MGE's experimental gas cost incentive mechanism, approved by the PSC below, violates Missouri law. As explained above, under the incentive mechanism, the PSC determines the benchmark price that it anticipates gas will cost over the following year. It recognizes that the actual price may vary somewhat from the bench-mark. It therefore sets a benchmark price for gas at a level which is 2% below what the PSC believes is likely to be the actual cost of gas. At the end of the year, when the actual gas costs for the prior year are determined, the PSC and the company review the actual cost of gas for the year. If the actual gas costs are determined to have met the bench-mark amount or are up to 4% higher than the benchmark (i.e., 2% higher than the actual anticipated price, since the benchmark is set at 2% below the actual anticipated price), the PSC will allow this amount of actual cost adjustment by the utility; in effect, it has determined to set the benchmark at 2% below what is anticipated, but has determined in advance that up to a 4% upward variation from the benchmark will be considered prudent.

If the actual gas costs were between 4% and 10% higher than the benchmark amount, the PSC has determined in advance that the gas company may only recover 50% of that difference in a cost adjustment; in effect, it has determined that the remaining 50% is imprudent. If actual gas costs are more than 10% above the benchmark, the PSC will undertake a traditional prudence review, and there will be a presumption that costs above this level were imprudent. If actual gas costs were between the benchmark level and 94% of that level, then 50% of the savings are passed on to the ratepayers. If actual gas costs are less than 94% of the benchmark level, then 100% of the savings will be passed on to the ratepayers.

As noted earlier, this incentive clause is in part intended to give the companies an incentive to buy gas as cheaply as possible; they know that they will not be able to pass on all of any costs over those anticipated by the PSC. It is equally intended to avoid the need to conduct prudence reviews of every cost variance, no matter what the size, and so would reduce the regulatory burden and costs experienced by the PSC and by the utility when undertaking the ACA process. Traditionally, those costs have been high because the PSC must undertake a prudence review of costs in each case.

Relators' Points Relied On fail to explain any reason why the incentive mechanism should be held invalid even if the basic PGA/ACA mechanism is affirmed, and many of the basic facts about the operation of the clause set out above were gleaned from a detailed study of the record. However, careful review of their briefs reveals the principal objection to the incentive mechanism is that it

allows the company's profit or loss to increase or decrease if it turns out that the company's actual costs did not exactly match the benchmark costs. This is not unique to the incentive mechanism. During the interim period between general rate cases, a utility's profits or losses will go up or down, depending on whether its rates were based on an accurate prediction of its costs. The use of a PGA or incentive PGA mechanism is not invalid simply because it also suffers from some lack of perfection. However, the PGA process in is fact far less likely to result in excess profits or losses than is a traditional rate case, for it allows the PSC to correct for unanticipated errors in every yearly ACA review. There is always the risk a particular purchase will be held imprudent, however. If it is, the company's rate of return will be affected, just as it would be in a general rate case.

In sum, the incentive mechanism is simply a specific application of the principles applied in any ACA proceeding. It in effect determines in advance that costs that are up to 4% over the benchmark will be considered prudent and costs from 4% to 10% above the benchmark are considered only 50% prudent, as are costs which are less than those anticipated. By setting out these basic rules, the companies and the PSC avoid needless administrative costs associated with prudence· reviews which would otherwise be necessary even though the actual costs varied by less then 10% from the anticipated costs. The PSC approved this approach on an experimental basis. Moreover, any variations in fuel cost which affect profit or loss, like other cost variations caused by regulatory lag, can and will be taken into account in the next rate proceeding. In the interim, however, use of the incentive mechanism keeps down unnecessary regulatory costs to the public without resulting in an imprudent increase in costs of providing service. It would be putting form over substance to approve a PGA/ACA procedure, but disapprove the more cost-effective and beneficial incentive mechanism. We fail to see how either approach violates the rule against either single-issue or retroactive ratemaking.

*F. Other Arguments.*

In the argument sections of their briefs the parties appear to also argue that the PGA/ACA or the incentive PGA/ACA are improper because the PSC has, in effect, let the companies set their rates, whereas the statutes require the PSC to do so, and because as a result of the many adjustments the rates are more properly characterized as variable rather than fixed, as required by the filed rate doctrine. We review for plain error, and find none.

■ The FAC at issue in *Utility Consumers Council* was found to come "dangerously close" to an abdication of the PSC's ratemaking authority because it permitted the electric utilities to simply pass on any amount they paid for fuel costs. Moreover, the companies could control much of those costs, for electricity, unlike natural gas, is not a natural resource. Its cost therefore is made up of the cost of such things as labor, raw materials, and so forth, costs which can vary greatly and which the utilities can control.

By contrast, natural gas, by definition, is a naturally occurring commodity. The gas costs which the PGA mechanism allows the companies to pass on are almost entirely the cost of obtaining the gas itself; they do not include the type of labor and material costs used in making electricity. Moreover, at the time use of a PGA clause was first adopted, the gas companies had no control over their fuel costs. They were required to buy from pipelines and the latter were in turn required by FERC to pass on to them certain fuel costs through their own PGA clause. Thus, the only question was to whom the utilities could pass through their own fuel costs and by what mechanism, much as was the case with the TAC at issue in *Hotel Continental.* As the gas industry became deregulated, and as the companies were permitted to purchase from more than a single source, they gained some level of control over their fuel costs, although through Order No. 636 and similar orders FERC still has a large role in deciding which costs can be passed on and to whom. Many of the costs included in a PGA clause are thus still mandated by FERC; the only issue is who will pay them, not how much will be paid.

Moreover, unlike in the case of a FAC, the PSC has not abdicated its ratemaking authority, for the PSC does conduct a prudence review of the PGA costs and approve the amount of the PGA before it goes into affect. If the PSC finds the fuel costs are unreasonable or the result of imprudent purchases, it can disallow some or all of the adjustment sought. Moreover, when an ACA is filed the following year, the PSC can and has disapproved some of the actual cost adjustment sought on the basis that the costs were imprudent. The incentive ACA also provides for a prudence review and penalizes the companies for costs more than 4% over the benchmark. The record thus does not support a finding that the use of the various PGA mechanisms constitutes an abdication of the PSC's ratemaking function.

■ We also reject the implication in certain of Relators' arguments that the PGA/ACA mechanism constitutes a violation of the filed rate doctrine. The purpose of the filed rate doctrine is to provide for a fixed rate so that a consumer can review the rates at any time and determine what his or her bill would be. *Utility Consumers Council,* 585 S.W.2d at 56. This doctrine was not violated by the TAC at issue in *Hotel Continental,* for the amount of tax passed on was always at a fixed level, not subject to variance by the utility. By contrast, the FAC at issue in *Utility Consumers Council* violated the filed rate doctrine for, while the formula used to determine the amount of the FAC charge at any particular time was fixed in the rates, what numbers were plugged into the formula depended entirely on the utility. As a result, review of the filed rate schedule would not allow the consumer to determine what rate was being charged. *Utility Consumers Council,* 585 S.W.2d at 56.

We do not believe that the PGA/ACA mechanisms at issue here violate the filed rate doctrine. Unlike the FAC, the PGA is not simply a formula set out in the gas utility's rates, and the utility cannot simply plug any number into that formula. Rather, the PGA mechanism requires the companies' published rates to actually contain a set and specific amount of adjustment for the year in question. The PSC must approve that PGA amount and incorporate it into the published rate before it can go into effect. Any consumer can look at the published rates at any time and determine the exact rate being charged. This contrasts sharply with the FAC, under which only the formula used to determine the FAC was made a part of the published rate. For these reasons, we hold that neither the PGA/ACA clause nor the experimental gas costs incentive clause violate the filed rate doctrine. We affirm the PSC's approval of use of those clauses in Phase II below.

## IV. APPLICATION OF PGA CLAUSE TO TRANSPORTATION CUSTOMERS

■ As noted above, the issues before the PSC had been divided into two phases. Phase II, discussed *supra* in Section III of this opinion, dealt with the legal validity of the PSC's use of a PGA clause and variations on it. We now deal with Phase I. In that phase, the PSC assumed the validity of a PGA clause, and considered MGUA's argument that the PGA clause, even if otherwise lawful, is unlawful as applied to its members because it charges companies who only transport and do not purchase gas for increased costs of the gas. It says that this is inherently unfair since the gas transporters do not use the gas, the charge to them is not proportionate to any purchases, and they have not caused or benefitted from any changes in gas prices.[3]

The PSC held an evidentiary hearing on Phase I from May 23, 1995, to May 24, 1995. MGUA's argument at that time, and now, basically boils down to this: the full name of the PGA clause is the *"purchased gas* adjustment clause." The clause is used to pass on costs incurred by MGE in purchasing gas. Even if Missouri law allows MGE to use a PGA clause to pass on those gas costs to its sales customers, MGUA argues, it makes no sense to pass on those costs to companies (like MGUA members) who do not purchase gas from MGE. This is because the costs included in the PGA are related only to the cost of gas purchased by MGE from its

---

**3.** Phase I also dealt with other issues, but they are not at issue on this appeal.

suppliers; MGUA members buy gas from companies other than MGE; MGUA members' only connection with MGE is that they use its pipelines to transport gas purchased from other companies; therefore, MGUA argues, MGE should not be permitted to pass its cost of gas to customers who do not buy gas but only use MGE's transportation services.

MGUA's argument has surface appeal. However, it depends on an underlying assumption which the PSC found to be invalid in its Phase I Report and Order, issued effective September 19, 1995. The PSC there rejected MGUA's claim that it is not responsible for any of the costs incurred by MGE and passed on through the PGA. The PSC determined that both sales and transportation customers in a very real sense are at least partially responsible for those costs, stating:

> The Commission observes that the only costs being passed through MGE's PGA which are borne by transportation customers are take-or-pay costs and certain transition costs (i.e., gas supply realignment costs and stranded investment costs). The Commission determines that nonsales customers shall continue to be obligated to pay for take-or-pay and certain transition costs implemented through MGE's PGA clause, because no compelling reason to segregate nonsales customers from sales customers with respect to the payment of these costs has been presented. These costs have arisen due to regulatory changes at the federal level. The Commission finds that transportation customers as well as sales customers contributed to cause these costs and transportation customers should therefore share financial responsibility with other consumers of natural gas for these costs.... Thus, the Commission finds, based on the record in this proceeding, that use of the PGA clause to recover take-or-pay costs and certain transition costs is the most reasonable

means to recover take-or-pay and certain transition costs from transportation customers.

In other words, the PSC determined that the transportation customers were all at one time sales customers, and that all benefitted from the deregulation of the natural gas industry. Thus, while the clause is called the *purchased gas* adjustment clause, it really accounts for and allocates the take-or-pay costs and other costs at issue, and they were in part caused by and should properly be borne by all of the companies, even those who purchase gas elsewhere. Those companies could not purchase gas elsewhere if FERC had not deregulated the market and allowed them to do so; many of the costs allocated under the PGA clauses are associated with that deregulation.

MGUA does not argue that there is no evidence in the record to support the PSC's determination that transportation customers contributed to these costs in that they benefitted by deregulation, which in turn caused the costs.[4] While we agree with MGUA that it might be more descriptive to give the clause a broader name than the *purchased gas* adjustment clause, we cannot say that its purpose must be limited by its name. Moreover, as the PSC notes, all the costs included in a PGA clause were caused indirectly by the opening up of the sales market for gas. Thus, the name is not unrelated to its purpose.

Whether given the name of purchased gas adjustment clause, or purchased and transported gas adjustment clause, the important issue is whether the PSC's order was lawful and reasonable and was supported by substantial evidence. Because the record supported the PSC's determination that MGUA members did benefit from deregulation and that use of the PGA clause is a reasonable way to spread the costs of deregulation to all those who benefitted, we affirm. *See also* our decision this date in the companion case of *State ex rel. Midwest Gas Users' Ass'n v.*

---

4. *MGUA does argue in the companion case also handed down today, State ex rel. Midwest Gas Users' Ass'n v. Public Service Comm'n*, 976 S.W.2d 485 (Mo.App.1998), that the record in that case fails to support the PSC's factual determinations that transportation customers benefit-

ted from deregulation. It also attacks the sufficiency of the findings of fact and conclusions of law made by the PSC. For the reasons stated in our decision in that case, however, we reject both those arguments.

*Public Service Comm'n,* 976 S.W.2d 485 (Mo. App.1998), in which we again address this and related issues regarding transportation customers.

For all of the reasons stated above, we affirm the determination of the Public Service Commission in all respects.

SPINDEN, P.J. and EDWIN H. SMITH, J., concur.